## OCEAN S. S. CO. *v.* THE TALISMAN.

*(District Court, S. D. New York.   October 20, 1888.)*

COLLISION—STEAMER AND TUG—RULE OF THE STARBOARD HAND.
   The steamer City of S. was coming into the North river from sea, and moving with the flood tide.   The steam-tug T., going down the river with a carfloat in tow, was nearer the New York shore, and on the starboard hand of the steamer, their courses not then crossing.   The latter, to approach her slip, ported, and attempted to cross the bow of the float, but was struck on her port bow, receiving damage, for which this suit was brought against the tug.   *Held*, that the fault of the collision was with the steamer, which, from her position, was bound to avoid the tow, yet attempted to cross her bow; that the T. did nothing to thwart any proper maneuver on the part of the steamer, but backed as soon as the intent of the S. was clear; and the libel against her should be dismissed.

In Admiralty.   Libel for damages.

Libel by the Ocean Steam-Ship Company against the steam-tug Talisman, for injuries to the steamer City of Savannah by collision.

*Rice & Bijur*, for libelant.

*Goodrich, Deady & Goodrich*, for claimants.

BROWN, J.   On the 11th of February, 1888, the libelant's steamer City of Savannah, in coming in from sea, collided with a car-float in tow

of the steam-tug Talisman, a little past 8 o'clock in the morning, and from 100 to 200 yards off Chambers-Street slip in the North river. All the witnesses agree that the City of Savannah, when off the Battery, and when off Courtlandt street, was not far from the middle of the river; that she afterwards ported, and at the time of the collision had swung around from three to six points towards the New York shore. The car-float, which was coming down, struck the City of Savannah on her port side, about 25 feet from her stern, doing considerable damage. The libelants claim that when the City of Savannah was nearly in mid-river, and heading directly up stream, the Talisman and her tow were seen nearly directly ahead from one-quarter to a half a mile distant, and about a quarter of a point on her starboard bow; that the Talisman was at that time heading somewhat across the river towards the Jersey shore; and that the swing of the City of Savannah to starboard was made in order to give the Talisman more room to the westward, but that her maneuver was thwarted by the Talisman's starboarding, and thereby swinging towards the New York shore. Upon careful consideration of the testimony, I cannot find this theory borne out by the weight of evidence, or the probabilities of the case. The tide was strong flood. The tug, heavily incumbered, could not have been making by land more than three knots, while the speed of the City of Savannah by land was from two to three times as great. Had the Talisman been near mid-river, and headed towards the Jersey shore, as claimed by the libelant, she could not possibly have turned so as to reach the place of collision so near the shore at the time that the Savannah reached that place, without turning about at once and heading almost straight for the New York shore, which it is not pretended she did, and which is incompatible with the libelant's other testimony. The Talisman, in coming from Weehawken, had followed the usual course, crossing the river to within 200 or 300 yards of the New York shore, and then following the line of the shore. There was no reason, after passing Tenth street, which must have been long before she was seen by the City of Savannah, for heading towards the Jersey shore, or for her being nearly in mid-river. The contrary is proved, not only by her own witnesses, but by disinterested witnesses from the Hoboken ferry-boats. The weight of proof agrees with the probabilities of the case, that when the Talisman was first sighted she must have been much nearer the New York shore than the City of Savannah, then nearly in mid-river. The City of Savannah was bound for her dock at Spring street. Having the Talisman on her own starboard hand, it was her legal duty to keep out of the way, and she took all risks of attemping to cross the Talisman's bow, instead of keeping to the westward of her, on her original course. She is in fault for this maneuver. From the place of collision, so near the shore, it is further clear that the City of Savannah must have persisted in her attempt to cross the Talisman's bows for a considerable time after it was safe to make such an attempt, instead of stopping and backing earlier, as she might easily have done, and thereby avoided the collision. The pilots of the Hoboken ferry-boats the Lackawanna and the Montclair strongly corroborate the general testimony of

the witnesses from the Talisman, as to the position and course of the latter.

As respects the Talisman, I think it clear that nothing on her part thwarted any proper maneuver of the City of Savannah. There was at first no danger; their courses were not crossing until the City of Savannah ported, to approach the New York shore. The Talisman was on the City of Savannah's starboard hand, and it was then the duty of the Talisman to hold her course. At the slow speed she was making against the strong tide, whether she starboarded her helm or not, (and I do not think that charge established,) she could not, in the short time after the alleged starboarding, have changed her position so much as to have made any difference in the result. The City of Savannah, after her first porting, had abundant means to keep out of the way of the Talisman by going to the westward. The pilot of the Talisman had no reason to suppose that the City of Savannah would persist in attempting to cross his bows, instead of passing to the westward, until shortly before the collision; and I am satisfied that he stopped and backed as soon as he had reason to believe that the City of Savannah intended to cross ahead of him, contrary to her duty. This was all that by the rules of navigation was required of the Talisman, under such circumstances, (*The Greenpoint*, 31 Fed. Rep. 231,) and the libel must therefore be dismissed, with costs.

I have not thought it necessary to discuss the evidence concerning the fog or thick weather, alleged by the witnesses for the City of Savannah, although upon this point it seems to me that the weight of evidence is clearly against her. From this point of view it would seem probable that no sufficient lookout or attention was directed towards the Talisman by the City of Savannah while she was approaching her pier, and that that may have been the real cause of the accident.